## STATE CORP. COMMISSION OF KAN. v. FEDERAL POWER COMMISSION.

## NORTHERN NATURAL GAS CO. v. FEDERAL POWER COMMISSION.

Nos. 14704, 14706, 14733, 14743.

United States Court of Appeals
Eighth Circuit.

July 20, 1953.

Jay Kyle, Topeka, Kan., and Louis R. Gates, Kansas City, Kan., for State Corporation Commission of State of Kansas.

F. Vinson Roach, Omaha, Neb., and Richard J. Connor, Washington, D. C. (Lawrence I. Shaw, Omaha, Neb., and Gallagher, Osherman, Connor & Butler, Washington, D. C., with them on the brief), for Northern Natural Gas Co.

Bradford Ross and Reuben Goldberg, Washington, D. C. (Bernard A. Foster, Jr., Washington, D. C., and Alvin A. Kurtz, Alexandria, Va., with them on the brief), for Federal Power Commission.

Carl W. Cummins, St. Paul, Minn., for Northern States Power Co.; Donald Evans, Des Moines, Iowa, for Iowa Power & Light Company; P. L. Farnand, Minneapolis, Minn., for Minneapolis Gas Co; some presenting oral argument for Interveners generally, and others limiting their argument to the Interveners they represent.

Raymond A. Smith, Council Bluffs, Iowa, for Council Bluffs Gas Co., and George C. Pardee, Omaha, Neb., for Metropolitan Utilities District of Omaha, waived oral argument.

Vernon Myers for Iowa Public Service Co.; Lloyd J. Marti, Lincoln, Neb., for Central Electric & Gas Co.; G. T. Mullin, Minneapolis, Minn., for Minneapolis Gas Co.; Franklin M. Stone, Waseca, Minn., for Western States Utilities Co.; Norman H. Nitzkowski, Mankato, Minn., for Minnesota Valley Natural Gas Co.; George B. Sjoselius, St. Paul, Minn., for State of Minnesota; Timothy P. Quinn, St. Paul, Minn., for City of St. Paul; John F. Bonner, Minneapolis, Minn., for City of Minneapolis; and Ned Willis, Perry, Iowa, for Perry Gas Co., with them on the brief, for interveners.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

These cases are brought to this court upon petitions filed under Section 19(b) of the Natural Gas Act, 52 Stat. 821, 831; 15 U.S.C.A. §§ 717, 717r(b), to review opinions and orders of the Federal Power Commission concerning rates, charges and practices of Northern Natural Gas Company, "a natural gas company" within the meaning of the Act.[1] Northern is the petitioner in all the cases except No. 14,704, where the Corporation Commission of the State of Kansas, a party to the proceedings before the Commission, is the petitioner. The Commission is respondent in all the cases, and utility customers of Northern have intervened.

Statement.

Northern, as of the close of 1950, was engaged in operations in seven midwestern states, owning and operating an integrated natural gas pipe line system, producing, purchasing, transporting and selling natural gas at wholesale to 27 non-subsidiary utility companies, which in turn served 136 cities and towns, and to its then wholly owned subsidiary (since absorbed by it), Peoples Natural Gas Company, which served 92 cities and towns. In addition, it was serving 16 large volume direct industrial customers in 19 locations, approximately 58 small volume drilling, pumping and irrigation customers, and approximately 1,600 domestic customers. The sales to the 27 utilities represented 80.52% of its total

[1.] "Natural Gas Company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for re-sale. Section 2(6).

sales, sales to its subsidiary Peoples, 10.48%, and sales to other customers 9% of total sales. Northern's own production accounted for 18.68% of this supply, of which 5.50% was produced in the Panhandle Field in Texas, 13.12% in the Hugoton Field in Kansas, and .06% in the Otis Field in Kansas, the remainder of 81.32% being purchased from other producers in Texas, Oklahoma and Kansas.

The proceedings before the Commission involved in Nos. 14,704, 14,706, and 14,743, arose out of rate filings made by Northern pursuant to the provisions of Section 4(d) of the Act [2] to increase its rates and charges by approximately $8,400,000 and to make other changes in rate schedules. The first of these rate filings was made on March 27, 1950, naming increases in rates and charges amounting to approximately $3,200,000. The second was made by Northern on October 27, 1950, and proposed further increase in its rates and charges of approximately $5,200,000. A third filing was made on January 11, 1951, which proposed changes in certain provisions of Northern's rate schedules but did not seek increase in the level of rates and is not involved in these review proceedings.

Hearings were commenced on the first rate increase filing in August 28, 1950, and were recessed on October 27, 1950, as the second rate increase filing was made on that day. The second filing was consolidated for hearing with the first and hearings were resumed on March 26, 1951, and concluded on July 20, 1951.

The test period adopted by the Commission was the 12-month period (used by petitioner and respondent Commission) of December 1, 1950 to November 30, 1951, which was the first year of operation of the company's system at 600 M c f capacity. The test period therefore reflects actual experience for only five months since the hearings were held and concluded during the test period.

Decision was rendered by the Presiding Examiner on January 18, 1952, and many exceptions were taken. After two days of oral argument before it, the Commission on June 11, 1952, issued its Opinion No. 228 and order prescribing rates to be charged by Northern which effected an increase applicable to Northern's customer companies of approximately $5,000,000 per annum over the rates in effect prior to the rate filing of March 27, 1950.

The Commission denied applications for rehearing except that it granted the application by Northern for rehearing in respect to an item of "working capital". Thereafter Northern filed its present petition for review of Opinion No. 228 and order in No. 14,706, and the Kansas Commission filed its petition for review thereof in No. 14,704. '

On September 25, 1952, the Commission after hearing in respect to the "working capital" item, entered its Opinion No. 228-A and order, affirming its determination as to the item "working capital" set forth in Opinion No. 228 and order of June 11, 1952, and Northern filed its present petition for review of the order affecting "working capital" in case No. 14,743.

Subsequent to the conclusion of the hearings on July 20, 1951, and prior to the Commission's Opinion No. 228 and order issued June 11, 1952, Northern filed on December 26, 1951, certain new schedules increasing its rates to its customer companies in an amount of $10,600,000 over its filings on March 27, 1950 and October 27, 1950.

Hearings on said third increase proposal were had on March 17, 18, 20, 24 and 25, 1952, and were then recessed after Northern had presented its showing except as it requested permission to submit at a later date testimony as to rate of return.

On June 26, 1952, fifteen days after the Commission's Opinion No. 228 and order, issued on June 11, 1952, the Commission's Staff and some of Northern's customers, interveners in the proceedings, severally moved for dismissal of a portion of the

2. Section 4(d) provides that unless the Commission otherwise orders, changes in filed rates and charges may not be made "except after thirty days' notice to the Commission and to the public", given by filing with the Commission a new schedule of rates and charges showing the proposed changes.

third rate increase in the amount of $7,601,-853 on the ground that Northern had included the same matters in its submission of the prior rate increases to the Commission and the Commission had disposed of them adversely to Northern by its Opinion No. 228 and order. Northern resisted the motions. After hearing, the Commission on July 30, 1952, issued its Opinion No. 233 and order, disallowing the items of the third rate increase filing which aggregated $7,-601,853.

The Commission authorized the continuance under bond only of the remainder of the third proposed $10,000,000 increase of rates and charges pending further hearings as to that remainder. Northern's application for rehearing on Opinion No. 233 and order was denied and it has filed its petition for review of it in No. 14,733.

The Commission found in its Opinion 228 of June 11, 1952, that Northern's average gas plant in service, including the average undeveloped leaseholds, as of November 30, 1951, represented $162,093,934, including in the determination $347,799 allowed for interest during construction. From the amount of $162,093,934 the Commission deducted the average reserves for depreciation and depletion amounting to $33,025,473, and contributions in aid of construction in an amount of $127,867. It then added thereto an allowance of $1,004,437 for working capital to arrive at an average net investment rate base of $129,945,031. On that rate base the Commission allowed an annual rate of return of 5½% (or a return of $7,146,977), which it found to be fair and reasonable.

It determined Northern's total cost of service, including return, to be $38,041,317 and allocated the costs between the business over which the Commission has jurisdiction under the Act and the business over which it does not have jurisdiction.[3] The

Commission found that there was a deficiency in revenues associated with jurisdictional business in an amount of about $5,000,000 compared with the cost of service, including a return of 5½ percent on property related thereto. In making the analyses and in arriving at the finding the Commission considered but ascribed no weight to an order which was promulgated by the State Corporation Commission of Kansas on February 21, 1951, modified March 8, 1951, requiring that all takers of gas from the Kansas Hugoton Field shall attribute to all gas taken (except gas for operation of leases) for all purposes, the fair and reasonable minimum value of not less than eight (8) cents per M c f at the well head. Rates, charges and classifications determined to be "just and reasonable" were prescribed for Northern to be effective June 11, 1952.

The Commission found that under the rates prescribed Northern should earn the determined fair rate of return on its investment in property devoted to jurisdictional business. But in prescribing the new rates the Commission disallowed Northern's application to issue two new rate schedules proposed by it, designated, respectively, Schedules Ind-1 and Ind-2, and acting under Section 4(e) of the Act, the use of the schedules was suspended. They purported to relate respectively to Northern's sales of natural gas for resale "for large volume industrial use only" and to sales of natural gas by Northern to gas utilities for their own use. They are more particularly described later on in the opinion.

The Commission found that the proposed Ind-1 and Ind-2 schedules were not of themselves complete rate schedules but were dependent on a general schedule called CD-1 and that Northern made no sales of gas to utility customers for industrial use only, or for any utility's own use, and that

3. Natural Gas Act. Section 1(b) "The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 52 Stat. 821 (1938); 15 U.S.C.A. § 717 (1946).

the sales it made to the utilities were all sales in interstate commerce for resale and therefore subject to the Commission's jurisdiction.

There was included in the schedules for rate increases proposed by Northern a provision for billing demand in the amount of 100% of the contract demand regardless of the actual volume of gas purchased by the customer utility, but the form of schedules prescribed by the Commission restricted the billing demand that may be made by Northern to an 80% minimum of contract demand.

The Commission also prescribed a new separate schedule for deliveries of gas in excess of contract demand.

*Petition for Review.*

The petition for review filed by Northern has challenged the Opinions 228, 228–A and 233 and Orders as invalid, and it is contended that the Power Commission erred:

(1) in concluding that the rates set by Northern in proposed schedules Ind-1 and Ind-2 were suspendible under Section 4(e) of the Act, 15 U.S.C.A. § 717c(e); [4]

(2) in refusing to attribute a value of 8 cents per M c f to the gas produced from Northern's own wells in the Hugoton field in Kansas;

(3) in its allocation of Northern's costs between the sales over which the Commission has and those over which it does not have jurisdiction;

(4) in allowing $347,799 instead of $579,-010 as interest during construction;

(5) in deducting $2,120,973 from the $3,125,410 allowed for working capital;

(6) in issuing its Opinion No. 233 and order dismissing $7,601,853 of Northern's third rate increase filing and refusing to put its $7,601,853 of increase rates into effect under bond pursuant to Section 4(e);

(7) in forbidding Northern's proposed change from an 80 percent minimum billing demand to a 100 percent billing demand;

(8) in prescribing a separate rate schedule for deliveries of gas in excess of contract demand;

**4.** 15 U.S.C.A. § 717c(e):

Section 4(e) "Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, or State commission, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect: *Provided,* That the Commission shall not have authority to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."

(9) in concluding that a 5½ percent rate of return was fair and reasonable;

(10) in failing to make adequate findings to support its conclusions, basing them on insufficient evidence, disregarding pertinent evidence and legal standards and acting arbitrarily, capriciously and in deprivation of Northern's constitutional rights.

The Corporation Commission of Kansas, pursuant to its petition for review, contends that the refusal of the Power Commission to attribute 8 cents cost per M c f at the well head to the gas produced by Northern in Kansas was erroneous. It also contends that the Opinion 228 and Order respecting Rate Schedules CD-1 and Hugoton Area sales should be remanded to the Power Commission with direction to determine actual costs to the cities which lie atop or are adjacent to the Hugoton Gas Field of Kansas.[5]

## Opinion.
### The Findings of the Commission.

In our consideration of the assailed findings and conclusions of fact made by the Commission, we are controlled by the provision of Section 19(b) of the Act that "The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." We recognize the duty to determine substantiality in the light of all that the record relatively presents, but as between two fairly conflicting views the court may not displace the Commission's choice, even though the court would justifiably have made a different choice had the matter been before it de novo. The review here is not de novo, but the division of functions assigned to the Commission and those assigned to the courts on review remains the same under the Administrative Procedure Act and the decision of the Supreme Court in Universal Camera Corp. v. National Labor Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, as it has always been recognized in this court.

It was well stated in Cities Service Gas Company v. Federal Power Commission, 10 Cir., 155 F.2d 694, 698:

"*Jurisdiction of the Commission and scope of review*—It is of first importance to take account of the respective provinces assigned to the Commission and the courts on review in order that we may perform the functions assigned to us without trespass upon the administrative prerogatives. The primary aim of the Natural Gas Act of 1938, 15 U.S.C.A. § 717 et seq., was to 'protect consumers against exploitation at the hands of natural gas companies.' Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333. To effectuate that purpose, the Act provides that all rates and charges subject to the jurisdiction of the Power Commission shall be just and reasonable, and declares that any charge which is not just and reasonable is unlawful. Sec. 4(a). To that end, the Commission is specifically authorized, after hearing, to determine 'the just and reasonable rate', and to fix the same by order. Sec. 5(a). Any aggrieved party to an order of the Commission may obtain a review to the appropriate circuit court of appeals, which is vested with 'exclusive jurisdiction to affirm, modify, or set aside such order in whole or in part. * * *'. But, 'the finding of the Commission as to the facts, if supported by the substantial evidence, shall be conclusive.' Sec. 19(b). In delineating the scope of review, the courts have left no doubt of their disposition to give the Commission a free rein in the effectuation of the Congressional purpose. The administrative process is no longer fettered by judicial notions of the 'economic merits' of the rate order."

█ 1. *The Suspension of Northern's Proposed Schedules Ind–1 and Ind–2.*

Northern contends that the Commission erred in finding that its proposed Rate Schedule Ind–1 was subject to suspension under Section 4(e) of the Act. It also

---

5. The several very substantial briefs that have been filed and oral arguments that were presented on behalf of customers of Northern have received consideration but do not require separate capitulation.

contends that the proposed Rate Schedule Ind-2 was not subject to the Commission's jurisdiction and therefore was not subject to suspension.

As to Rate Schedule Ind-1. Northern does not contend that the sales of natural gas for resale "for large-volume industrial use only" to which the rate schedule by its terms purported to relate, are not subject to the Commission's rate fixing power. Its contention is only that suspension of the rate schedule was prohibited by the proviso of Section 4(e), reading as follows:

"Provided, That the Commission shall not have authority to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only".

With respect to the Rate Schedule Ind-2. Northern's contention is that the rate schedule relates to sales of natural gas by Northern to gas utilities for their own use and that such sales are completely exempt from the Commission's jurisdiction, and consequently not subject to suspension by Section 1(b) of the Act, providing as follows: "* * * The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas * * *."

In its Opinion 228 the Commission said:

"The record, however, does not bear out Northern's contentions. The IND-1 and IND-2 schedules are not of themselves complete rate schedules but are dependent on the C D-1 rate schedule, which Northern does not deny was subject to suspension and is subject to our jurisdiction. Additionally, the record conclusively establishes, and we find, that Northern makes no sales of gas to utility customers for indus-

trial use only or for such purchaser's own use; that the gas to which the IND-1 and IND-2 schedules are intended to apply is actually sold under Rate Schedule C D-1 which is applicable to sales for resale for residential, commercial and small industrial users. For these reasons, we find that the IND-1 and IND-2 schedules were subject to our suspension power in accordance with Section 4(e) of the Natural Gas Act and within the purview of the suspension authority therein conferred upon us and were suspended by our order issued April 26, 1950."

It appears [6] that at the time Northern filed its proposed Rate Schedule Ind-1 and Ind-2 on March 27, 1950, it had for its main line system only one general service rate schedule, identified as its C D-1 schedule for the sale of natural gas to its gas utility customers for all uses. The rate was stated in the C D-1 rate schedule as a two-part rate, consisting of two charges, a demand charge and a commodity charge. The requirements of the utilities under the C D-1 rate schedule were determined by the requirements of their domestic commercial and small volume industrial customers and were purchased for sale for all uses. Northern was making no sales of gas to the utility customers for industrial use only or only for the gas utilities' own use. Northern's gas was delivered to them in one indistinguishable mass to the town border station, at which point the sale was consummated. Title to and control of the gas upon passing through the metering station vests in the gas utility and Northern control and obligations are terminated. At that time the ultimate disposition of the gas is unknown. From the town border station the gas flows, usually at reduced pressures, into the gas utility's distribution system, where it is resold for residential, commercial and industrial uses. In some customer's systems, the purchased gas is commingled with gas manufactured by the gas utility with the result that there is no

---

**6.** A record in six printed volumes is made up of parts excerpted verbatim from the 67 typewritten volumes of record in these cases. Statements of facts are adopted from the printed record except where it has been necessary to go to the typewritten matter.

way of determining the destination of the gas purchased from Northern. At times all of the gas must be used to meet resale customers' requirements, but at other times, during off-peak periods for example, some part of the gas is available for the gas utility's own use or for resale on an interruptible basis for industrial use.

Northern's operations were not proposed to be and were not in fact altered when it filed rate schedules Ind-1 and Ind-2. The schedules were created by Northern in the thought that the rates would be put beyond the authority of the Commission to suspend because they were formulated to relate by their terms to separate sales for resale made by Northern to the gas utility customers which were for industrial use only and separate sales to the utility customers which were not for resale. They were inseparably connected to the C D-1 schedule by the fact that they provided on their face that they were available only to gas utilities which purchase "Contract Demand under Northern's Rate Schedule C D-1". The Commission declared in view of the substantive facts of Northern's operations:

"The contract demand is the amount estimated by the purchasing utilities as required to meet firm requirements of their domestic or residential, commercial and small industrial users on peak day. This gas when delivered by Northern is available for all these uses and at no time is gas delivered by Northern for or with the understanding that it is for industrial use only or for the purchaser's own use. No part of the gas is 'earmarked' for any particular customer or use. Indeed, it is not disputed, that if any part of the gas delivered by Northern is sold by the purchaser to a large industrial user (a sale purportedly covered by IND-1) or is used by the purchaser (a sale purportedly covered by IND-2), the volumes so used are included as part of the volumes delivered in satisfaction of Northern's contract demand obligation under C D-1 schedule. This is, of course, consistent with the fact that the gas is sold for resale to domestic, commercial and small industrial users and is not sold either for industrial use only or solely for the purchaser's own use.

"In the face of these facts we do not think Northern's contentions as to IND-1 and IND-2 may be sustained. But, additionally, there is actually no rate for the services purportedly made available by the IND-1 and IND-2 rate schedules. Northern's rates are two-part rates, consisting of a demand charge and a commodity charge. Admittedly, the IND-1 and IND-2 schedules contain only the commodity charge and reference must be had to the C D-1 schedule for demand charge. Without reference to the C D-1 schedule the charge for the services purportedly available under IND-1 and IND-2 cannot be computed. The C D-1 schedule is an inseparable part of the IND-1 and IND-2 schedules. The significance of this lies in the fact that the C D-1 schedule relates to sales for resale for domestic, commercial and industrial uses and the demand charge is associated with such services. In short, the IND-1 and IND-2 rate schedules are not only incomplete rate schedules but actually there is neither a complete rate nor complete rate schedule for services claimed to be non-suspendible and non-jurisdictional.

"The inseparable nature of the C D-1 and IND-1 and IND-2 schedules would bring about an absurd result if Northern's contentions were sustained. One part of the rate, the demand charge, would be subject to suspension, whereas another part of the rate, the commodity charge, would not be subject to suspension or even subject to our jurisdiction. This absurd result, we think shows that Northern's claims are untenable."

The particulars of Northern's argument in support of the non-suspendibility of its Ind-1 and Ind-2 rate schedules are substantially remarshalled by it in its discussion of the Commission's decision in City of Hastings v. Kansas-Nebraska Natural

Gas Co., Inc., Docket G 1487 F.P.C. Opinion No. 244, issued February 5, 1953.

Northern argues that in that case the natural gas company which sold the city natural gas for resale under a two-part demand and commodity charge rate schedule was permitted by the Commission to use a separate billing for the gas which was consumed by the city itself in its power plant and the Commission held that it did not have jurisdiction over the natural gas company's charge for that service. Northern has pointed out in its brief a number of particulars in which the service to the City of Hastings was the same as that rendered by Northern to its utility customers for which it proposes its Ind-2 rate schedule here involved. It is insisted that the Commission's lack of jurisdiction was the same here as the Commission itself found in the City of Hastings case.

But in that case it was expressly found by the Commission that there was a long subsisting contract between the natural gas company involved and the City of Hastings by the terms of which the gas company sold the City the interruptible supply of gas it used itself in the power plant by direct sale to the City for that use. The Commission said,

"* * * our analysis above shows that the parties had effectively established separate rates for separate sales under two separate contracts—the town border resale contract subject to our rate regulatory powers, and the direct sale power plant contract exempt by statute from our rate authority. * * * the distinguishing circumstance here is that the parties in fact and in law consummated a separate and long continued direct sale beyond our jurisdiction. * * * Having found that the gas consumed by the City at its electric generating plant is not the subject of a resale but rather of a separate sale for consumptive use, we are directly forbidden by Section 1(b) to fix the rate of such sale."

But in the case at bar, Northern's contracts with its utility customers are like the town border contracts in the City of Hastings case. They are "sale for resale" contracts which are made subject to the jurisdiction of the Commission by the plain terms of Section 1(b) of the Act. Both the demand charges which Northern makes in its sales of natural gas for resale to its utility customers and its commodity charges that are added to make up the full price charged for such gas are within the jurisdiction of the Commission. It was not open to Northern to withdraw its business from that jurisdiction by the expedient of issuing schedules Ind-1 and Ind-2 to cover its charges either in whole or in part for the gas it sells for resale. In the absence of proof such as existed in the City of Hastings case of direct sales for industrial use or for the purchasing utility's own use, the statute conferring the jurisdiction to regulate on the Federal Power Commission is controlling.

In United States v. Public Utilities Commission, decided April 6, 1953, 345 U.S. 295, 73 S.Ct. 706, it appeared that California Electric Power Company produced electricity in California by hydro-electric projects licensed under the Federal Power Act as amended by the Public Utility Act, 16 U.S.C.A. § 791(a) et seq., and marketed the greater portion of it subject to the State Public Utilities Commission's authority in that state. The company sold power under duly executed contracts to the Navy Department and to Mineral County, Nevada, for resale and for consumption there and having obtained permission from the State Commission to raise its rates, undertook to impose the new rates on the Department and on the County. The Federal Power Commission issued an order to the Company to show cause why the rates as to the two purchasers were not subject to exclusive federal jurisdiction. The issues were heard by both Commissions in a joint proceeding and both decided in favor of their own asserted authority. The Supreme Court of California upheld the State Commission and the Court of Appeals of the 9th Circuit, California Electric Power Co. v. Federal Power Commission, 199 F.2d 206, upheld the Federal Commission. On writs of certiorari from the Supreme Court of the United States to the Supreme Court of California, it was held

that the federal authority was paramount and exclusive and the decision of the Supreme Court of California was reversed.

In the course of the opinion, at page 303 of 345 U.S., at page 711 of 73 S.Ct., the Court said that the jurisdictional lines between local and national authority in the regulation of such sales in interstate commerce as are involved,

> "were not finally determined until this court's opinion in Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549. This decision followed the Federal Water Power Act by some seven years. In short, that case established what has unquestionably become a fixed premise of our constitutional law but what was not at all clear in 1920, that the Commerce Clause forbade state regulation of some utility rates. State power was held not to extend to an interstate sale 'in wholesale quantities, not to consumers, but to distributing companies for resale to consumers'. 273 U.S. at page 89, 47 S.Ct. at page 296. Attleboro reiterated and accepted the holding of Pennsylvania Gas Co. v. Public Service Commission, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434, that sales across the state line direct to consumers is a local matter within the authority of the agency of the importing state. But it prohibited regulation of wholesale sales for resale by either interested commission."

In the same case, the Supreme Court also considered the contention that as it appeared that both the Navy and the County used some of the power bought from the California company for their own purposes, that fact deprived the Federal Commission of power to regulate the whole sales. The court held that as the electric power was sold to the Navy and to the County under contracts like those in the case at bar, containing no limitations on the rights of the purchasers, the contention could not be sustained. The court said that the problem was, 345 U.S. 317–318, 73 S.Ct. 719,

> "whether the entire sale is a 'sale for resale.' For purposes of this case, we need not decide the question of whether a somewhat similar 'commingling'— of power resold with that consumed directly by the purchaser—requires entire federal jurisdiction. For, even assuming arguendo respondents' proposition that it may be proportionally limited, we hold that the record before us in this case does not present a set of facts or findings justifying that result. By the statute, Commission jurisdiction extends to 'sales for resale,' 'but not to any other sale.' § 201(b). The problem, then, in applying respondents' suggested interpretation, is to decide just what power transaction falls within this category of 'sale for resale'— whether one involving the entire volume of electricity transmitted to the Navy or merely that which the buyer resells to others; the determinant is the delineation of 'sale for resale.' See Panhandle Eastern Pipe Line Co. v. Public Service Commission, 332 U. S. 507, 516–517, 68 S.Ct. 190, 194–195, 92 L.Ed. 128. Assuming respondents' theory, this would turn, of course, on whether an essentially separate transaction covering the power directly consumed by the purchaser is identifiable. The present record will not permit such a finding."

We think the record here equally precludes such a finding. We find no error in the Commission's exercise of jurisdiction in suspending the proposed schedules Ind-1 and Ind-2.

2. *The Kansas 8 Cent per M c f Valuation Order.*

Opinion 228 of the Commission includes the following:

> "The Kansas Commission Attribution Order.
>
> "Northern produces natural gas in the Hugoton Field, located in the State of Kansas. The gas produced in that field constitutes one of Northern's sources of supply for its sales in interstate commerce of natural gas for resale. Respecting the production of natural gas in the Hugoton Field, the Corporation Commission of the State

of Kansas entered an order on February 21, 1951*, as subsequently modified on March 8, 1951, requiring:

"'* * * all persons, firms or corporations which have taken gas or caused gas to be taken from the Kansas Hugoton Field since March 1, 1949, or which are taking or causing gas to be taken from said field, shall, from and after March 1, 1949, attribute to all gas taken (except gas for the operation of leases), for all purposes, including the payment to producers, land owners, lease owners and royalty owners, the fair and reasonable minimum value of not less than Eight (8) cents per thousand feet at the wellhead until the further order of the Commission in the investigation instituted in Docket No. G–164.'

"Based solely on these provisions of the Kansas Commission's order, Northern contends that it is required to include the gas which it produces from the Hugoton Field at an 'attributed' value of 8 cents per M c f in computing its cost of service and that by reason of the requirement placed upon it by the order, we are legally bound in fixing just and reasonable rates to disregard the actual cost of such gas and to substitute 8 cents per M c f for whatever the actual cost. The effect of Northern's contention would be to add a fictitious $1,914,574 to Northern's actual cost of service.

"Northern does not, and of course could not, claim that the $1,914,574 will be incurred by it or that it represents cost. Nor does Northern contend, that disallowance of the claimed value would be confiscatory. Neither does Northern contend, nor has it attempted to show, that sound economic reasons exist for a departure from an actual cost of service basis for fixing just and reasonable rates. Its contention, stated baldly, is simply that: The Kansas Commission has ordered this and we are legally bound to obey.

"On the facts of this case and after consideration of Northern's contentions, we find that the actual cost of the gas to Northern is all that can be allowed."

In the brief for the Federal Commission in this court it is stated that "there is no dispute that the dollar difference involved between the Commission's allowance of the actual cost of production of Hugoton Field gas (approximately 5¢ per M c f) and the allowance of the claimed value thereof at 8¢ per M c f is $1,914,574" (as asserted by Northern). It is also sufficiently established by the record that Northern's contention joined in by the Kansas Commission for an allowance of a value of 8¢ per M c f must rest, as the Commission stated, on the above order of the Kansas Commission. The Federal Commission's refusal to enforce the Kansas "attribution order" does not effect confiscation. The sole question that results from it on this review is, as indicated in the Commission's opinion, whether or not the Federal Commission was bound to obey the Kansas Commission's order in performing the Federal Commission's function of regulating Northern's rates.

Although it is argued that the sovereign state rights of Kansas are involved and that there has been unconstitutional invasion thereof by federal authority, we think the problem is rather to determine the extent of the power to regulate Northern's sales in interstate commerce for resale that Congress has conferred upon the Federal Power Commission. Undoubtedly Congress has power under the Commerce clause of the constitution to regulate commerce in natural gas between the states and it is equally clear that to some extent it has undertaken to do so.

"* The order of February 21, 1951, was preceded by an interim order of February 18, 1949. This order was sustained by the Supreme Court of Kansas in Kansas-Nebraska Natural Gas Co. v. State Corporation Commission [169 Kan. 722], 222 P.2d 704, rehearing denied [170 Kan. 341], 225 P.2d 1054. This order and the order of February 21, 1951, are substantially the same with the exception that the latter order required that the 'value' be attributed to gas taken from the field 'for all purposes'."

By Section 1(a) of the Natural Gas Act it declared that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest." To that end it vested authority in the Federal Power Commission to require natural gas companies to keep records appropriate for administration and exercise of the power to regulate their rates and charges. Through the course of years the Commission has established its method of regulating a natural gas company [7] by first ascertaining its costs and then comparing such costs with the charges exacted from its customers. The essential factor of the method is a system of accounting that shows such costs and that is the system that has been imposed on the natural gas companies. It includes no means of showing values of the companies' properties, but by virtue of the showing of the costs and the charges the Commission has been kept informed of the relation between what they paid out and what they took in, and has been able through that knowledge to uniformly regulate them during a number of years.

A contention has long been reiterated that the regulation of a business affected with a public interest must include consideration of just return on the fair value of the used and useful property. Probably no rate case is contested before the Commission in this era of high prices without a revivor of that contention. We think the argument here that the Commission is bound to give effect to the 8 cent valuation made in Kansas is merely such a revivor of it. It is simply another attempt to prevent the Federal Commission's exercise of its power to regulate within the confines of its jurisdiction according to its own judgment by reference to costs and charges, and without reliance upon opinions as to values.

This court is firmly committed that no reversible error is inherent in the Commission's method of regulation. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 8 Cir., 1944, 143 F.2d 488, loc. cit. 492, which was affirmed, 324 U.S. 635. We followed the decisions of the Supreme Court to that effect in Canadian River Gas Co. v. Federal Power Commission, 10 Cir., 1944, 142 F.2d 943, affirmed, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

In the absence of the order of the Kansas State Commission there could be no questioning of the Commission's power to regulate on the cost basis the charges Northern makes for gas it produces from its own wells in the Hugoton Field and sells in interstate commerce for resale. The Supreme Court holds on full consideration that the regulation of a natural gas company's charges may be made by the Commission through that method without consideration of values of the gas in the field or at the company's well heads.

In Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 324 U.S. 635, 65 S.Ct. 821, 828, 89 L.Ed. 1241, the company contended that "it was incumbent on the Commission to determine the field price or actual field value of natural gas in the areas in which petitioner produces gas," but the Supreme Court affirmed this court's rejection of the contention. In Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L. Ed. 1206, the court established the legality of the Commission's method in the regulation of charges of a natural gas company regardless of the company's claim that its

7. As to Northern in this case this method involved the determination of a rate base consisting of Northern's gross investment in its production and transportation properties, less accrued depletion and depreciation associated with those properties, plus a working capital allowance, and the application to that rate base of a "fair rate" of return designed to produce revenue reimbursing Northern for its actual costs of service, including the actual cost of gas produced and purchased by Northern to render the service, interest on long term debt, and a fair return on its common stock and surplus (the equity).

gas had a fair value at the well heads far in excess of its costs. The law as established by the Supreme Court in these cases and in the case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, is that Congress has vested the power in the Federal Commission to regulate in the national interest the charges natural gas companies may make for the gas they sell in interstate commerce for resale and that in accomplishing the regulation the Commission is free from the compulsion of giving any weight to the element of value of the companies' gas at the well heads.

In that state of the federal law there is no room for the exercise of any local power to obstruct or prevent the lawful functioning of the federal agency entrusted with the federal power of regulation. The federal power to regulate the commerce in natural gas derives directly from the constitution and is, of course, the dominant power. To the extent that Congress has entered the field, exercised its power and authorized its Commission to regulate charges by natural gas companies for the gas they produce and sell in interstate commerce for resale, its mandate must prevail. The decisions of the Supreme Court in the Panhandle, Colorado Interstate and Hope cases all turned squarely upon the issue and affirmed that Congress has made such grant of power to the Federal Commission.

The only argument that merits discussion to the point that there was a power in the Kansas Commission to override and invalidate the Federal Commission's regulation is the argument that such an inference may be drawn from the Supreme Court's decisions in Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190, and Phillips Petroleum Co. v. State of Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204. As to those cases, it is not claimed that they make any reference to or expressly qualify or overrule the prior cases in that court which fully sanction the Federal Commission's method of regulation. But argument is drawn from them to induce this court not to follow the Hope, Panhandle and Colorado Interstate cases in this case.

In Cities Service v. Peerless, the facts as stated by the Supreme Court were that the respondent Peerless was the owner and operator of producing gas wells in the Hugoton Gas Field in Oklahoma, but had no pipe line outlet of its own. It proposed to sell the potential output of its wells to Cities Service, the operator of an interstate gas pipe line system in the field, but was dissatisfied with the terms obtainable. Peerless accordingly applied to the state commission to order Cities Service to make connection with a Peerless well and purchase the output. Peerless also requested the Commission to fix a price and to require Cities to pay for it. The state commission upon hearing and due proceedings concluded that there was no competitive market for gas in the field, that the integrated well and pipe line owners were able to dictate the prices paid to producers without pipe line outlets and that as a result gas was being taken from the field at a price below its economic value. It further concluded that the taking of gas at the prevailing prices resulted in both economic and physical waste of gas, loss to producer and royalty owners, loss to the state in gross protection taxes, inequitable taking of gas from the common source of supply and discrimination against various producers in the field. On the basis of these findings the Commission issued the two orders that were challenged in the Supreme Court. The first provided "that no natural gas shall be taken out of the producing structures or formations in the Guymon-Hugoton field—at a price at the well head, of less than 7¢ per thousand cubic feet of natural gas measured at a pressure of 14.65 pounds absolute pressure per square inch". The second directed Cities Service "to take natural gas ratably from * * * [Peerless] wells * * * in accordance with the formula * * * prescribed" and "at the same price * * * indicated in the general field price order."

Cities Service appealed to the Supreme Court of Oklahoma which affirmed the orders. From the judgment of that court

Cities Service appealed to the Supreme Court of the United States on the grounds that the due process and equal protection clauses of the Fourteenth Amendment and also the Commerce Clause, Art. 1, § 8 of the Constitution of the United States were violated.

Mr. Justice Black was of the opinion that the alleged federal constitutional questions raised on the appeal were frivolous and all the Justices were agreed that the Due Process and Equal Protection issues raised by the appellant "were virtually without substance". But a very brief opinion of the court was directed to consideration of the constitutional issue claimed to arise under the Commerce Clause. The court made it clear that it did not consider whether the State Commission's orders might come into conflict "with the federal authority asserted by the Natural Gas Act," [340 U.S. 179, 71 S.Ct. 221] and observed that the Federal Power Commission had not participated in the proceedings and it gave no further consideration to the Natural Gas Act. It said,

"Whether the Gas Act authorizes the Power Commission to set field prices on sales by independent producers, or leaves that function to the states, is not before this Court."

When the restrictions on the scope of the issues involved in the case, so recognized and stated by the court, are borne in mind, it is manifest that the decision was intended to be narrowly applicable to the particular situation before the court. After stating as elementary that "The Commerce Clause gives to the Congress a power over interstate commerce which is both paramount and broad in scope", the court declared, 340 U.S. 179, 186, 71 S.Ct. 215, 219, "It is now well settled that a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce." And proceeding from there the court finds nothing in the Commerce Clause of the federal constitution to prevent Oklahoma from compelling the pipe line company monopolizing natural gas transportation in the Oklahoma gas field to take and transport the gas from the Peerless wells in that field on fair and non-discriminatory terms, including the payment of a fair price for it. Or to prevent the promulgation of rules to effect the same treatment of others situated like Peerless.

But the argument that the decision affords justification for this court to fail to follow the elaborately studied and expounded law laid down by the Supreme Court in the Panhandle, Canadian River and Hope cases, lacks persuasion. In those cases the court told the Power Commission that it could regulate natural gas companies' charges by the method it has applied here. It says nothing to qualify those instructions in the Peerless case and our only duty is to enforce the Commission's exercise of the authority so sanctioned by. the Supreme Court.

The case of Phillips Petroleum Co. v. State of Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204, was decided by the United States Supreme Court on the same day as the Peerless case and was referred to by the Court as "a companion case". Phillips complained of the same order of the Oklahoma Corporation Commission fixing a minimum well head price for gas taken from the same field. The State Commission had concluded that Phillips had no standing to attack the order since he was complying with it. The State Supreme Court disposed of Phillips' appeal to that court in a paragraph not here relevant. The Supreme Court of the United States said that the appeal to it presented "only minor variations of the issues raised by Cities Service", and we discern no points decided in the case by that Court that are material to the issues here.

Both Northern and the Kansas Commission have placed stress and reliance upon the clause of Section 1(b) of the Natural Gas Act, 15 U.S.C.A. § 717 (b), providing that the Act "shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." They argue that this exclusion of "production or gathering" from the operation of the Act prevents the

federal authority from regulating the charges of the "natural gas company" as it has done here on the basis of the company's production and delivery costs.

Our conclusion that the contention is refuted by the Supreme Court in the cases we have referred to is supported by the recent decision of the Court of Appeals for the District of Columbia in State of Wisconsin v. Federal Power Commission (Phillips Petroleum Company), 205 F.2d 706. The issue in that case was whether or not the Phillips Company was a natural gas company and as such subject to have its charges for its sales in interstate commerce of natural gas for resale regulated by the Federal Power Commission. That Commission was of opinion that Phillips' transportation in interstate commerce, together with its processing operations and its sales of natural gas, "all constitute a part of its gathering business, or they are incidents of or activities related to such business, so that such movements, processing, and sales come within the exemption of production and gathering in Section 1 (b) of the Act."

The Court analyzed and discussed the Supreme Court cases and decided that it was the duty of the Federal Power Commission to regulate Phillips' charges for the sales Phillips made which were analogous to the sales that Northern makes in this case. The Court said:

"The Commission finds that the sales involved here are sales in interstate commerce of natural gas for resale. That finding is not disputed. It follows that no state can regulate these sales. It was plain long before the Natural Gas Act was passed that 'state regulatory power could not reach high-pressure trunk lines and sales for resale. This was the "gap" which Congress intended to close.' Federal Power Commission v. East Ohio Gas Co., 1950, 338 U.S. 464, 472–473, 70 S.Ct. 266, 271, 94 L.Ed. 268. As we have shown, the Supreme Court has determined that Congress closed it."

In footnotes 9 and 10 the Court added:

"Since Phillips' sales are made after the gas has been gathered into trunk lines Cities Service Gas Co. v. Peerless Oil & Gas Co., 1950, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190, is irrelevant. That case upholds a state's power, in aid of conservation, to fix minimum prices for natural gas sold at the wellhead for interstate movement. Such sales are obviously made during the 'production and gathering' which Congress reserved to state control, and it 'is now well settled that a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce.' 340 U.S. at page 186, 71 S.Ct. at page 219. Moreover the Supreme Court has said: '*prior* constitutional decisions, not what we have since decided or would decide today, form the measure of the gap which Congress intended to close by this Act.' Federal Power Commission v. East Ohio Gas Co., 1950, 338 U.S. 464, 472, 70 S.Ct. 266, 270, 94 L.Ed. 268."

"Again on April 7, 1953, the Court said: 'Especially in the litigation arising under the Gas Act has this Court expressed the view that the limitations established on Commission jurisdiction therein were designed to coordinate precisely with those constitutionally imposed on the states.' United States v. Public Utilities Commission of California, 345 U.S. 295, 311, 73 S.Ct. 706, 716."

■ We are not in disagreement with the decision of the Court of Appeals for the District of Columbia in this Phillips case. We conclude that the Commission was not in error in subjecting the charges of Northern for natural gas it sold in interstate commerce for resale to regulation on the basis of its costs and in refusing to accede to the 8 cents M c f valuation ordered by the Kansas Commission.

3. *Allocation of Costs.*

■ Northern's business consists in part of direct sales to industrial and domestic consumers and in part of sales to public utilities for resale. Only the latter portion of Northern's total sales are sub-

ject to regulation by the Federal Power Commission. In its regulation of Northern's sales subject to its jurisdiction, it is obvious that in determining just and reasonable rates the Commission has the duty and power to determine the costs involved in those sales. The problem is not simple and there is no exact mathematical formula leading to a conclusive result.

The difficulty, of course, arises out of the fact that all the gas handled by Northern, both for regulated and unregulated sale, passes through and is processed and distributed by an integrated set of facilities. In addition, there are among Northern's industrial consumers what are termed "interruptible" customers. Service to such customers can be curtailed by the gas company whenever the company needs the gas to meet the "firm" requirements of its other customers. Thus, although through the course of a year the interruptible customers may use very substantial quantities of gas, during a time of maximum demand when other consumers are drawing all or a large portion of their "firm" gas requirements, the interruptibles may be drawing very little gas. Thus, in the case under review, during the 12 months ending October 31, 1950, 9.85% of the total annual volume of gas delivered is shown to have been direct (unregulated) sales, while on an average of 3 peak days (not the "peak-period" days actually used in the calculations of the Commission) only 2.77% of the volume was direct sales. However, facilities are installed and certain expenses are incurred on the basis of the maximum demand of the customer rather than on the basis of his average daily use—and this fact becomes important because the "firm" customers have priority over the interruptibles up to their firm requirements and the facilities of the gas company must necessarily be sufficient to meet all the firm requirements no matter how much gas is drawn on a certain day.

The problem is apparent. In enacting the Natural Gas Act the Congress did not provide any formula for the Commission to follow in its considerations of the problem. In that situation the courts will be slow to reject any solution adopted by the Commission as long as the Commission keeps within the statutory bounds of the scheme of regulation. We recognize that, as stated in Colorado Interstate Gas Company v. Federal Power Commission, 324 U. S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206, "Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science. * * * Under this Act the appropriateness of the formula employed by the Commission in a given case raises questions of fact not of law." Our review of the questions concerning allocation will be governed accordingly.

The charge which Northern makes for the gas it sells is made up of two elements, called demand charge and commodity charge, of which the Commission must take cognizance and which is adequately described in Mississippi River Fuel Corp. v. Federal Power Commission, 82 U.S.App.D. C. 208, 163 F.2d 433, 438, where it is stated: "The basis of the demand-commodity formula is the difference between costs which occur by reason of required plant and equipment capacity and costs which occur directly in the handling of the gas. The company must have the capacity to supply certain demands when made. That capacity must be available whether or not it is being used at any particular moment. Thus, such costs do not vary from time to time but, generally speaking, continue constant, or substantially so. They are demand, or capacity, or fixed costs. Other costs are incurred only when, as and if gas is being made, transported or sold. They relate to the commodity itself. They are commodity, or volumetric, or variable costs. They obviously vary with the sales."

In its brief Northern states that the issues presented in the allocation of costs problem are three: "The first is the problem of whether it is appropriate to assign costs for all of Petitioner's transmission system to the Hugoton area sales. [This point is discussed last in the allocation of costs category.] The second problem relates to the classification of individual components of costs as between demand and commodity for the purpose of allocation, and the third relates to the selection of a peak period

which should be utilized in determining a proper allocation of demand costs."

Turning to the problem of selecting a peak-period for the purpose of allocating the demand costs, we find that Northern and the Commission are in agreement that the three day period January 8, 9, and 10, 1951, represents the system-peak period— that is, the time when Northern's system as a whole is carrying its peak load. The Commission used that period. Northern contends, however, that although the period used was representative of the peak load of Northern's entire system, that that system peak load should have been averaged with the "firm" gas requirements peak. The firm peak, Northern contends, would be shown by the average of the three coldest days, January 29, 30 and 31, 1950, when the domestic users would be using the maximum amount of gas for heating purposes. The Commission rejected Northern's contention, and used, in calculating the demand costs, the system peak period alone. The Commission stated in its opinion: "Sales during the coldest days do not, however, necessarily represent a period of operation of Northern's system at maximum capacity. But they do represent the period when space heating customers are taking gas at their maximum demand and the jurisdictional portion of sales is maximized. By diluting the allocation percentages derived from the three-day period of maximum operations with percentages derived from a period when jurisdictional sales are at their greatest, the result is to reduce the assignment of capacity costs to non-jurisdictional sales and to transfer costs normally assigned to non-jurisdictional business to jurisdictional business."

■ We feel that the selection of the system peak period for the purpose of allocating the demand costs was well within the scope of the Commission's discretion. The Commission has considered the matter fully, set forth the reasons for its rejection of Northern's contentions, and has arrived at a result which we cannot say is unreasonable. Another method might possibly be more reasonable or more accurate, but such possibility does not justify reversal by this court of reasoned conclusions of the Commission. Further, the Supreme Court in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 592, 65 S. Ct. 829, 89 L.Ed. 1206, approved the use of the system peak method, although it did not limit the Commission's approach to that method alone.

In this regard it might be said that the Commission's statement that Northern's "method of assigning demand costs is not supported by any sound reasons" should not be approved. The method that Northern advocated in the case under review was similar to that employed by the Commission itself in the Mississippi River Fuel Corporation case, reversed on other grounds in 82 U.S.App.D.C. 208, 163 F.2d 433, 438, 440. We agree with the statement made by the court in that case that "The use of the system peak day for the distribution of demand costs may well be a proper subject for further examination by the Commission and the courts in a case in which the facts indicate inaccuracy in the result thus reached." We do not feel that the facts herein warrant our further investigation into the matter, but it can hardly be contended that the use of the system-peak method alone is an absolute answer for all cases.

Using the system peak period, the Commission determined that 98.26% of the total demand costs were costs relating to jurisdictional, or regulated, sales of Northern. The commodity or volumetric figures showed that 92.91% of commodity costs were related to regulated sales. If the system peak-period method used by the Commission is approved, then apparently Northern has no complaint as to the actual percentages arrived at by the Commission.

Petitioner's further contentions on the allocation problem are based on its disagreement with the Commission's allocation of costs between the demand, or fixed, costs and the commodity, or variable, costs. Since a higher percentage of demand costs, as compared with commodity costs, relate to jurisdictional business, it is apparent that it is to Northern's advantage to put all the costs possible in the demand category. Basic to Northern's general position is its contention that "once the character of the

cost is determined [that is, whether the cost is fixed or variable], the realm of judgment is passed and the demand-commodity formula requires that fixed costs be allocated to demand and volumetric costs be allocated to commodity."

Concededly, the Commission did not so apportion the fixed costs. Instead, for example, the Commission assigned the item of depreciation (a fixed cost) 50% to the demand component and 50% to the commodity component. The Commission does not set out fully its reasons for its departure from its former 100% allocation of fixed charges to demand in Opinion 228. It refers for such reasons to its opinion in Atlantic Seaboard Corporation, Opinion No. 225, decided April 23, 1952, wherein it is stated: "We are unable, however, to accept the premise that merely because certain costs do not vary with use they automatically become in toto demand or capacity costs." The Commission follows that statement with an explanation of its reason for so acting, going on to say: "A pipe line would not normally be built to supply peak service, that is to say, service on the peak days only. We know from our administration of Section 7 of the Natural Gas Act, which involves the issuance of certificates of public convenience and necessity, that pipe lines are built to supply service not only on the few peak days but on all days throughout the year. In proving the economic feasibility of the project in certificate proceedings, reliance is placed upon the annual as well as the peak deliveries. Stated another way, the capital outlay for the pipe line facility is made—and justified—not only for service on the peak days but for service throughout the year. Both capacity and annual use are important considerations in the conception of the project and in the issuance of certificates of public convenience and necessity. Both capacity and volume, therefore, are what are known as cost factors or incidences in respect to the capital outlay for a pipe-line project. It follows that reasonably accurate results can be achieved only by allocating the fixed expenses flowing from the capital outlay to both operating functions, viz., capacity and volume."

■ We do not feel that the Commission is bound to follow its past practices if experience and study show that those prior practices should be modified. In the subject under discussion we feel it is peculiarly within the Commission's discretion to so alter their application of the demand-commodity approach to the problem of allocation as to reflect what appears to the Commission to be important factors not previously considered. The Commission here applies its expert judgment, it has informed the court of the reasons for its action, and the action itself is not so unreasonable that it calls for reversal. The Commission has exercised its "judgment on a myriad of facts," and it is not for the court to overrule that informed judgment. Further, we do not feel that the demand-commodity formula is so rigid and absolute that the Commission cannot alter it. In general then, Northern's contention that use of the demand-commodity method in the manner it was used herein was erroneous as a matter of law, is rejected.

Northern specifically objects to the allocation of Production and Gathering Costs, Transmission Compressor Station Labor, Administrative and General Expenses, Depreciation, and Property Taxes.

■ Production and gathering costs were assigned by the Commission 100% to commodity. The Commission stated: "It is the uniform practice in the industry to purchase gas in the field on a straight commodity basis. And there appears to be no justification for a difference in treatments of the costs related to purchased or produced gas. The costs are directly related to the annual volumes of gas produced and sold. Therefore, we find that the treatment of production costs as commodity costs and their assignment to customers in proportion to annual sales to such customers is proper." The petitioner, on the other hand, as stated in its brief, "classified into demand and commodity components the items of expense that relate to producing and gathering the gas from Petitioner's own acreage according to the nature of the expense." We see no such unreasonableness in the Commission's decision to treat purchased and produced gas in the same manner—i. e.,

as 100% commodity—as would justify reversal.

With regard to Transmission Compressor Station Labor, Northern classified that item 75% to demand and 25% to commodity, the Commission Staff classified the item 100% commodity, and the Commission in its opinion adopted an allocation of 50% to demand and 50% to commodity. Here again it seems to the court that the Commission has exercised its expert judgment and we cannot say the result is unreasonable.

The total Administrative and General Expenses of Northern were allocated to "Production", "Transmission", and "Distribution and Other". It is with regard to the portion allocated to "Transmission" that Northern contends that the Commission has erred. After first determining the portion of the total expenses allocable to "Transmission", the Commission then allocated Transmission general expenses to the demand and commodity components "on the ratios developed from all other supervised expenditures, exclusive of compressor station fuel". The Petitioner, on the theory that the various parts of the administration and general expenses "are not homogeneous but cover a variety of items", gave separate consideration to various items entering into the whole amount. The Petitioner alleged that such grouping of the various items of expense could be done in a convenient manner and would reflect a more accurate picture. In its opinion, the Commission states: "To give any consideration to this method, equal treatment should be accorded the thousands of other items of expense making up the total cost of service. Obviously this would be unworkable."

Again the limited scope of our review precludes the overturning of the Commission's decision. It may well be that the Petitioner's method would be more accurate, but it is proper for the Commission, which is charged with the administration of the Natural Gas Act, to consider the practical effect of more detailed studies in this regard. The conclusion of the Commission as to a certain way of handling one phase of such a complicated administrative

function as allocation of costs carries great weight with the reviewing courts.

Petitioner's contentions as to the handling of the item of Depreciation, which the Commission allocated 50% to demand and 50% to commodity, is bottomed on its premise in this matter of allocation that fixed charges *must* be charged 100% to demand. Depreciation being a fixed charge, Northern contends it is mandatory that the Commission allocate it 100% to demand.

Since we have rejected Northern's contention that a fixed charge *must* be allocated entirely to demand, the Commission's decision to allocate depreciation in the manner it did must be upheld. We are not unmindful of the decision in Mississippi River Fuel Corporation v. Federal Power Commission, 82 U.S.App.D.C. 208, 163 F.2d 433, where at page 447, the court states: "* * * it [depreciation] would seem to be the purest of demand charges." However, in that case the cause was remanded with an order that the Commission make adequate findings. In the case at bar, we feel the Commission has made adequate findings and has expressed its basic reasoning. It is not so clearly erroneous as to justify reversal.

The Property Taxes paid by Northern were found to be a constant cost and were allocated 50% to demand and 50% to commodity. Again Northern's basic contention is that this is erroneous in that fixed charges must be allocated 100% to demand. As we have rejected that contention, we also reject Northern's contention with regard to the property taxes.

We find no such error in the Commission's order with respect to the allocation of costs between Northern's jurisdictional and non-jurisdictional business as would justify reversal. The Commission's order in that regard is affirmed.

*Hugoton Area Sales. Zone Rates.*

Under these headings the Commission said in Opinion 228:

"Hugoton Area Sales.

"Pursuant to Commission order of January 6, 1944, 4 FPC 480, Northern acquired the transmission lines of its subsidiary Argus Natural Gas Com-

pany, Inc. (Argus), which transported natural gas produced in the Hugoton Field for distribution in several communities in southwestern Kansas and for delivery into Northern's mainline system. Argus, at that time, operated distribution systems in the Kansas communities served by this pipe line and Northern proposed to charge town-border rates to Argus which were designed to enable Argus to continue in effect its retail rates. Subsequently, Peoples Natural Gas Company, a subsidiary of Northern, acquired the distribution systems in these southwestern Kansas communities. However, because of this historical relationship, Northern has always treated sales from the old Argus system, even though augmented at times by deliveries from its main line, on a basis different from mainline sales.

"In Docket No. G–1382, Northern proposed to increase charges for its sales in the so-called Hugoton Gas Field area and to such effect filed new schedules F–1, I–1, I–2 and I–3. No analysis of rate base or costs of service relating directly to sales in this area was put in evidence, either by Northern or the Staff. Both Northern and the Staff presented system-wide cost of service studies, which included the costs of the Hugoton area sales. Northern's allocation witness segregated such costs and excluded them from his allocation studies, assuming that costs equaled revenues, and subtracting the revenues from total costs to be allocated. The Staff, on the other hand, treated Hugoton area sales as a class of sales and assigned costs to all classes of sales on the basis of peak-day and annual volumes. The Staff's analysis supports the conclusion that costs exceed revenues, even with the proposed rate increases for sales in the Hugoton area.

"From the foregoing, it may be concluded that the proposed increase in rates in Rate Schedules F–1, I–1, I–2 and I–3, as filed by Northern on April 26, 1950, should be allowed to take ef-

fect as of the effective date of this Opinion and Order. Moreover, we find that such rates were properly put into effect, under bond, on September 27, 1950, and that Northern is justified in retaining. money collected since that date under such rate schedules."

"Zone rates: Northern at present has system-wide rates with the exception of its sales in the Hugoton area, discussed under a separate heading [the discussion set out above]. Council Bluffs advocated zone rates for Northern's sales. In support of its contention, Council Bluffs presented detailed studies of proposed zones and proposed specific zone rates. However, on a system as complex as Northern's, the determination of proper zone rates, to our mind, requires more thorough and exhaustive study. Other methods of allocating costs between zones might be more reliable than the pipeline mileage method utilized by Council Bluffs. Moreover, the delineation of zones requires scrupulous care if such zones are not to be arbitrary or discriminatory. Council Bluffs' witness, who prepared these studies conceded, upon cross examination, that his use of state lines as zone boundaries was arbitrary and that other boundaries might reasonably be fixed. For the foregoing reasons, and from our examination of the record, we do not believe that there is sufficient evidence before us to determine at this time whether zone rates for Northern's system are in fact proper, and if so, what such zones and such rates should be. There is now pending a proceeding upon a proposed rate increase by Northern in Docket No. G–1881 and we think it appropriate that the problem of zone rates be explored in that proceeding."

The Kansas Commission complains that the Federal Commission acted arbitrarily and unfairly in thus adopting a system-wide basis of allocation of costs by which "it burdened the cities in Kansas which are atop of or adjacent to the gas fields with a portion of. Northern's transmission costs up and down its main transmission line all

the way to the twin cities of Minnesota." It prays in its petition for review that the portion of the Opinion No. 228 and Order respecting Hugoton Area Sales be reversed and remanded with directions to the Federal Power Commission to determine actual costs, including transmission, gathering charges, line losses and miscellaneous charges to the cities involved which lie atop or are adjacent to the Hugoton Gas Field of Kansas.

Northern complains that the Commission system-wide allocation improperly shifted costs to the Hugoton area sales that should be assigned to other customers. It argues that Northern adduced evidence before the Commission determining the cost of service for the Hugoton area communities and allocating this cost of service and that under the rates it proposed revenues would equal costs of service to the Hugoton area.

Section 5(a) of the Natural Gas Act provides that "the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company". And to the extent that the Commission was asked to make a special order in respect to the Hugoton area sales the burden of proof was put upon the proponents by Section 7(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1006(c), and Section 4(e) of the Natural Gas Act, 15 U.S.C.A. § 717c(e).

The Kansas Commission states in its brief that its general counsel "advocated a system of zone rates" in the proceedings before the Federal Power Commission, but it did not introduce any evidence in support of its contentions. Our examination of the evidence to which Northern has referred us satisfies that it did not cover all the costs involved in the rates it proposed for the Hugoton area. The mere fact that the cities within the Hugoton area are in proximity to the gas fields, and other customers are farther away, does not of itself justify preferential rates for the area.

The declaration of the Commission "We do not believe that there is suffi-cient evidence before us to determine at this time whether zone rates for Northern's system are in fact proper and if so what such zones and such rates should be" is borne out by the record. Whether or not appropriate opportunity to explore the problem of zone rates for Northern is presented in Docket No. G–1881, it is clear that the proponents of zone rates have made no record in this case to afford a basis for the establishment of such rates. We find no reversible error in the action taken by the Commission in respect to the rates Northern proposed for the area.

4. *Interest during Construction.*
Under the above heading the Commission said in Opinion 228:

"Paragraph 5(17), Gas Plant Accounts—Instructions of our Uniform System of Accounts Prescribed for Natural Gas Companies sets forth our policy with respect to interest during construction as follows:

"'Interest during construction includes a net cost of borrowed funds used for construction purposes and a reasonable rate upon the utility's own funds when so used.'

"In accordance therewith, we have generally allowed the actual cost of borrowed funds and a 6% rate of interest on corporate funds used for construction purposes. It has been our practice to refuse to allow the capitalization of interest during construction at rates which would result in a high profit during construction for the allowance is not for the purpose of providing the company with a fair rate of return before operations begin. It should be noted that the quoted instruction relates to 'interest'. We believe that 6% is the maximum rate that can be claimed in these times.

"During the year 1950, the major part of the construction funds was provided by the issuance of $40,000,000 of 2⅞% serial debentures at an effective interest rate of 2.66% and by 2% short-term bank loans of $13,000,000. $9,591,750 was also raised by the issuance of 304,000 shares of $10 par value

common stock. These equity funds, the record shows, were used only during the first three and last three months of 1950, and from March, 1950, to October, 1950, the borrowed funds were used.

"Notwithstanding the facts respecting the use of the funds for construction purposes, Northern has applied an over-all rate of 6% which, when broken down by classes of funds, provides a rate of 10% on the equity funds. Obviously 10% is an unreasonable rate for interest.

"Allowing the actual interest rate on borrowed funds and a rate of 6% on equity funds, we find that the allowance for interest during construction is $347,799, computed as follows:

| 1950 | Interest on Borrowed Funds | Interest on Equity Funds |
|------|------|------|
| January | | $ 5,190 |
| February | | 15,845 |
| March | $ 901 | 11,944 |
| April | 8,835 | |
| May | 16,100 | |
| June | 19,904 | |
| | 13,435 | |
| July | 72,306 | |
| August | 63,384 | |
| September | 56,886 | |
| October | 31,298 | 5,762 |
| November | | 19,581 |
| December | | 6,428 |
| | $283,049 | 64,750 |
| | 64,750 | |
| Total | $347,799." | |

In its attack upon the foregoing conclusions Northern contends that $579,010 should have been allowed for "interest during construction" instead of $347,799. It is stated in its brief that there is no dispute that financing for the year 1950 was accomplished by the issuance of $40,000,000 of 2⅝ percent serial debentures, bank loans of $13,000,000 and the sale of 304,000 shares of common stock, $9,519,750. But to arrive at its interest figure of $579,010 Northern has evidently figured more than the Commission's 6% interest on the equity funds of the Company. It refers us to testimony of its rate of return witness that investors look for a return of 11% on their investment and to testimony of the Commission's witness that the investors return on the equity should be 9.2 percent. But we do not find any reversible error in the Commission's conclusions in respect to this item. Northern refers to no court decisions in support of its complaint against the action of the Commission and manifestly the Commission's determination of the amount allowable for the purpose in question was within its especial province and jurisdiction.

■ 5. *Commission's Allowance for Working Capital.*

In determining the rate base of $129,945,031 on which the Commission found the company entitled to earn a fair return, it included $1,076,934 for working capital. In Opinion 228 it said that Northern and the Staff were agreed on a working capital allowance of $3,125,410, consisting of materials and supplies in the amount of $2,048,476 and a cash allowance of $1,076,934, representing ⅛ or 45 days of the total annual expenses which require working capital. The Commission concluded that $2,120,973, which was 75 per cent of the income tax ($2,827,964) allowed for the test year should be deducted from the $3,125,410 because "it was provided by customers to meet Northern's Federal income tax liability long in advance of the time when the liability must be met."

Prior to its decision in The Matter of Alabama Tennessee Natural Gas Company, Opinion No. 226, decided April 30, 1952, the Commission did not adjust the working capital requirement to take into account tax accruals and the formula employed by Northern and the Staff in arriving at the $3,125,410 figure did not take them into consideration. The date of the Opinion 228 in the Northern case was June 11, 1952. Since April 30, 1952, the amount of working capital has been adjusted for federal taxes by the Commission as in this case and the action is fully sustained by the Court of Appeals of the Third Circuit in Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 3 Cir., 1953, 203 F.2d 494.

We are not in disagreement with that court's decision.

The Commission said in Opinion 228 as to its action respecting working capital:

"We realize the issue was not specifically raised at the hearings but all necessary facts to compute the adjustment are in the record and the principle that such an adjustment is proper is not open to debate."

Northern applied for rehearing in respect to this point, alleging that the issue had not been raised in the hearings and proceedings; that there was an absence of disagreement between Northern and the Commission Staff; that the Commission changed the method of computing working capital previously used by it in other cases, and that as a result Northern was deprived of property on which it was entitled to fair earn[ings] without due process of law. The rehearing was granted and Opinion 228 A and Order were entered upon the rehearing.

The conclusions in respect to working capital allowance of Opinion 228 were adhered to after the rehearing in Opinion 228 A.

On this review Northern does not contend that federal income tax accruals may not be considered as available for working capital purposes and taken into account in determining the amount to be included in the rate base for working capital purposes. Its contentions now are to the effect that the amount of $3,125,410 which had been agreed to by Northern and the Commission Staff at the hearings as the proper amount to be allowed for working capital already reflected deductions of tax accruals and that the Commission's deduction of $2,120,973 from the $3,125,410 represents a duplicate deduction.

It also contends that the Commission deducted too high a percentage (75%) of the federal income taxes it held to be available for working capital purposes.

The contentions were considered and answered in detail by the Commission in its Opinion 228 A and we do not find on examination of the evidence to which we are referred by Northern that the findings and conclusions of the Commission in that opinion are not supported by substantial evidence. On the contrary, there is substantial evidence that throughout the proceedings and hearings culminating in Opinion 228 and Order no issue was made on the Commission's regularly used method of computing the working capital allowance, that the amount of $3,125,410 was reached by that method and that it does not give effect to the existence of the tax accruals as a source of working capital. We hold that the Commission was not obligated to use or apply the "balance sheet" approach in computing working capital allowance that has been resorted to by Northern's accountant and that there was no reversible error in the allowance for working capital fixed by the Commission.

6. *The Dismissal of a Portion of Northern's Third Rate Increase Filing.*

In No. 14,733 Northern has filed a separate petition to review Opinion 233 and Order of the Federal Power Commission issued July 30, 1952, whereby the Commission denied a portion of the third rate increase proposal filed by Northern.

It appears that during the pendency of the proceedings before the Commission in respect to the first and the second rate increase proposals filed by Northern, certain issues became clearly defined, were tried out, and were decided and disposition made in respect to them by the Commission in its Opinion No. 228 and Order issued June 11, 1952. Northern's third rate increase proposal was predicated in substantial measure upon the same contentions so put in issue, contested and decided by the Commission, and at the time of the issuance of Opinion No. 228 and Order on June 11, 1952, a separate hearing had already been held where Northern had been called on to present its evidence to justify its contentions in support of the third rate increase proposal and had done so. Items of increase aggregating $7,601,853 in the third rate increase proposal were items included in and tried out and decided adversely to Northern by the Commission in Opinion No. 228.

One of the matters going to make up the amount of $7,601,853 was the contention

that the Federal Power Commission was bound to attribute the 8 cents per M c f valuation of gas at Northern's own well heads in obedience to the order of the Kansas Commission. That contention accounted for the amount of $1,914,574 of the $7,601,853 total and we discuss and decide it in another part of this opinion. The other items of contention are similarly distinct and plainly identified and are also discussed and decided herewith.

■ To obtain judicial review of the decision of the Commission on those items, Northern was required by the statute to first apply to the Commission for rehearing in respect to them as they were decided in Opinion 228, and on denial of such application, to file petition for review in this court (section 19(a) and (b) ), and it has duly followed that procedure. All the controverted items aggregating $7,601,853 included in and relied on for the first and second and then for the third rate increase were urged upon the Commission again in application for rehearing of Opinions 228 and 228 A, and were again denied and are now for review by this court in Nos. 14,704, 14,706, and 14,743. Stays of the Orders 228 and 228 A and 233 have been granted here.

On June 26, 1952, the Commission Staff counsel filed a motion to dismiss Northern's third rate increase proposal to the extent that the issues involved in it had just been decided by the Commission adversely to Northern's contentions. Although Northern contested the motion, it did not show at the hearing thereon that there was any new evidence or changed condition affecting the $7,601,853 increase that had not already been submitted to and passed on by the Commission. It is evident from the record therefore, that if the Commission had allowed the $7,601,853 items to remain pending in Northern's third rate increase schedule the Opinions 228 and 228 A and Orders disposing of the same items would have been practically nullified. Northern's proposal was to continue indefinitely to charge its customers on the basis of its disallowed increase of $7,601,853, regardless of adverse decision upon it by the Commission. Its position for aught that appears

would justify it continuing the same course, notwithstanding judicial affirmance of the Commission. We do not think the statute can be construed to permit such a course of procedure by Northern.

■ In dismissing the portion of the third proposed rate increase that it had considered and decided in Opinions 228 and 228 A, the Commission did not impinge upon any substantial right of Northern. Northern's right to apply for rehearing of the Commission's Opinions and to obtain judicial review thereof, and also to stay of the orders, remained open and constituted completely adequate remedies for relief against any error that may have been committed by the Commission in its decisions. We are not shown any particular in which Northern was prejudiced by the Commission's action on the Staff's motion for dismissal of the $7,601,853 items and we hold that Northern's petition for review in No. 14,733 is without merit.

■ 7. *Minimum Billing Demand.*

The Commission found in Opinion 228, that:

"Northern, for several years prior to the filing of March 26, 1950, operated under a tariff which provided in the CD-1 rate schedule that when a utility's demands declined below its contract demand, Northern would bill it for only so much as the utility actually purchased, with the minimum billing demand to be 80 percent of the contract demand. During the summer months the billing demand was fixed at a flat 80% of the contract demand. In its filings of March 27, 1950, October 27, 1950, and January 11, 1951, Northern has provided that the billing demand under the CD-1 schedule shall be the contract demand regardless of the maximum volumes purchased by the utility.

"Under the provisions sought to be enforced by Northern, utilities will be billed a demand charge upon a take or pay-for basis for all gas contracted for. Where a pipe line company has a large peak load for a short period of time which utilizes the full capacity of

the pipe line, and for the remainder of the year has a large excess capacity, that company might be justified in requiring the customer utilities to pay for such capacity throughout the year, whether used or not. But as the load factor increases on a pipe line, we believe that the company becomes less and less justified in charging its utility customers for demands which they do not take. Where a pipe line operates at or near capacity throughout the year, as Northern does, to charge one utility for gas it does not take, while at the same time selling such gas to another customer, is unduly discriminatory. Northern is a mature operating company, with one of the highest load factors in the industry, and is confronted at the present time with the major problem of obtaining reserves adequate to meet the high annual demands for gas or of discouraging such demands. Under these circumstances, we find that the proposed change from an 80 percent minimum billing demand to a 100 percent billing demand is unreasonable and unduly discriminatory, and we shall not allow such change to go into effect. Therefore, we find that since September 27, 1950, and from and after the effective date of the rates prescribed herein for the future the proper provisions for monthly billing demand are similar to those contained on Original Sheet No. 5, Original Volume No. 1, of Northern's tariff, relative to winter billing demands, which was in effect prior to the tariffs here under investigation. Under such a provision, Northern's practice for winter periods would not change, but it would bill its customers for the summer months on a basis consistent with its winter billing.[16] "

"16. As the provision relating to the months of April to October would allow customers to take in excess of 80% of their contract demand and pay no demand charge thereon, we shall not accept such provision. As shown in Appendix A, of this Opinion, we adopted the following language as the proper definition of Billing Demand:

In its attack upon the conclusions and order of the Commission in respect to Northern's proposed change from an 80% minimum billing demand to a 100% billing demand, Northern argues that the demand charge in its proposed rate schedule is unrelated to the volume of gas sold and that its utility customers will not be billed a demand charge upon a take or pay basis for all gas contracted for, as stated by the Commission. It also suggests that its demand charge may be considered in the nature of rental for the beneficial use of Northern's facilities rather than as part payment of the price of gas. We think it constitutes part payment for gas and our consideration of all the evidence to which the briefs refer us convinces that the findings and conclusions of the Commission on this point are amply supported and are without error.

■ 8. The Commission made findings and conclusions as follows in respect to:

"*Rate Schedule for Overrun Interruptible Gas:* At the present time, several of Northern's customers take substantial volumes of gas in excess of their contract demand on an interruptible basis. Northern has no separate rate schedule for such gas, and the utility is charged for such gas merely the commodity charge of the demand-commodity rate. As we have pointed out above in our discussion of the minimum billing demand provision, Northern would charge utilities not taking their contract demand volumes the demand charge for such gas, and assess only the commodity charge against companies purchasing the gas. The sale of gas above the contract demand volumes on an interruptible basis is a separate service for which there should be a separate rate schedule, as required

" 'The Billing Demand in effect for a billing month, in a particular community or billing group served by Gas Utility shall be the maximum volume of gas delivered by Northern to the Gas Utility under this rate schedule on any day of such month, but not less than 80% of the Contract Demand, nor more than the Contract Demand.' "

under our rules.[18] We believe also that the rate for such service should include not only the commodity cost related thereto, but, in addition, should include some of the demand cost related thereto. The Staff's proposed Rate Schedule R-1 describes the service provided and it appears to represent reasonable demand and commodity costs associated with such service. Therefore, the Staff's Rate Schedule R-1 will be prescribed for this service."

Section 154.11 of its General Rules and Regulations to which reference was made in footnote 18, provides that "The term 'rate schedule' means a statement of a rate or charge for a particular classification of transportation or sale of natural gas subject to the jurisdiction of the Commission, and all terms, conditions, classifications, practices, rules and regulations affecting such rate or charge."

Northern complains of these conclusions and the order and contends that by means of them the Commission in effect prescribed rates for nonjurisdictional sales, but we do not so conclude. The finding that the sale of gas above the contract demand volumes on an interruptible basis is a separate service is supported by the evidence and we find no error in the Commission's conclusions and order in respect to it.

9. *Rate of Return.*

On the subject of the rate of return, the opinion of the Commission is as follows:

"Northern contends that a fair rate of return in this case is not less than 6%, whereas the Staff contends that a fair rate of return is not in excess of 5½%. We have examined all of the available evidence of record on this subject and are convinced and find that a 5½% rate of return will produce a fair and reasonable 'end result'. F. P. C. v. Hope Natural Gas Co., 320 U.S. 591, 601, 603 [64 S.Ct. 281, 88 L.Ed. 333]; Bluefield Water Works & Improvement Co. v. P[ublic] S[ervice] C[ommission], 262 U.S. 679, 692, 692–693 [43 S.Ct. 675, 67 L.Ed. 1176]; United Railways [& Electric Co. of Baltimore] v. West, 280 U.S. 234, 261–262 [50 S.Ct. 123, 74 L.Ed. 390].

"Northern's capitalization at December 31, 1950, was as follows:

|  |  | Amount | Percent |
|---|---|---|---|
| Long Term Debt |  | $78,000,000 | 56 |
| Common Equity: |  |  |  |
| Common Stock 2,740,500 shares, $10 par | $27,405,000 |  |  |
| Premium on Common Stock | 14,463,750 |  |  |
| Capital Surplus | 56,719 |  |  |
| Earned Surplus | 19,484,055 | 61,409,524 | 44 |
| Total Capitalization |  | 139,409,524 | 100 |

"From our examination of the relevant evidence we think that the conclusion is required that Northern's capitalization is reasonable.

"The outstanding debt of Northern in the amount of $78,000,000 was issued and sold to the public, including all costs of flotation, at a cost of 2.55%.

Northern agrees that the actual cost of its debt is 2.55% and we find that it is a proper measure of the cost of borrowed money in determining a fair rate of return in this case.

"With respect to the proper allowance for the common stock equity of Northern, a study of investors' appraisals of the common stock of seven natural-gas companies indicates that during the period 1946 to the conclusion of the hearing that investors were re-

"18. Section 154.11. General Rules and Regulations."

quiring an average return on their investment of about 8.1%. As of the most recent date available in this record, April 30, 1951, the evidence indicates that investments were then being made by investors in the seven companies on a 7½% earnings-price ratio basis. Even when we look to the data with respect to the four natural-gas companies relied on by Northern as indicative of investor requirements, we find that such evidence indicates that the securities were selling during the period 1946 to the conclusion of the hearing on an average return basis of 8½% and, on May 31, 1951, at 7.3%.

"The evidence also indicates that on a dividend basis investors were purchasing the common stock of the seven natural-gas companies, from 1946 to 1950, inclusive, on an average yield basis of 5.1%. This yield was associated with a payout of common earnings averaging 57½%. During this same period investors were purchasing the common stock of the four companies on an average yield basis of 5.3%, associated with an average payout of common earnings of 59.1%.

"With respect to the purchase of Northern's common stock the evidence indicates the purchase of that stock, during the same period, on an average yield basis of 5.6%, associated with an average payout of common earnings of 62.7%. At the very latest date information is available in the record, April 30, 1951, the yield on common stock of the seven companies was 5.3%, in the four companies, 5.2%, and on Northern's stock, 5.1%.

"A 5½% rate of return would provide a return on Northern's common stock equity of 8.75% after an allowance of ½% to cover cost of financing, and which is after income taxes.

"An 8.75% allowance for common equity with a 62.7% payout will result

in a yield of 5.49%, which is in excess of average yields of the seven companies since 1945. We find, therefore, that a 5½% rate of return for Northern is fair and reasonable." *

Aside from the statement that the Commission "examined all of the available evidence of record", the finding that a 5½% rate of return will produce a fair and reasonable "end result" seems to rest solely on the comparison of investors' appraisals of the common stocks of seven natural gas companies. The seven companies studied by the Commission were the only natural gas companies out of the 87 reporting to the Commission whose common stock was held by the public and traded on a recognized exchange. For the purpose of its study, the Commission considered the seven companies in two groups—first, the seven companies together, and second, four of the companies as a group. The second group of four, one of which was Northern, were primarily transmission companies, while the other three companies derived the bulk of their revenue from direct sales to ultimate consumers rather than from sales for resale.

The Commission stated that on April 30, 1951, the yield on the common stock of the seven companies was 5.3%, of the four companies 5.2%, and of Northern 5.1%. The Commission then makes its conclusion that a 5½% rate of return will yield Northern's common stock equity a return of 8.75% after an allowance of ½% for costs of financing, that the 8.75% allowance for the common stock with a 62.7% payout will result in a yield of 5.49%, which is in excess of average yields of the seven gas companies. From these facts and conclusions, the Commission makes its ultimate finding, "that, therefore a 5½% rate of return for Northern is fair and reasonable".

The importance of the rate of yield of the various gas companies' stocks cannot be denied, but we are not impressed that

---

* Footnote by the court:
The actual rate set by the Commission appears to provide a return very slightly in excess of the 5½%. As the Commission stated in its opinion: "The application of these rates results in the test period of revenues which exceed cost of service by approximately $50,000."

the comparative yield is all-important. Investigation of other rate cases decided by the Commission discloses that much broader discussions and considerations were gone into in other cases than are to be found in the Commission's opinion in the case under review.

In the case of Panhandle Eastern Pipe Line Company v. Federal Power Commission, 324 U.S. 635, 650, 65 S.Ct. 821, 828, 89 L.Ed. 1241, the Supreme Court discusses what effect the allowed rate of return would have on the capital structure of Panhandle. The Court said:

> "We are unable to say on these undisputed facts that the return [6½%] is not commensurate with the risks, that confidence in petitioner's financial integrity has been impaired, or that petitioner's ability to attract capital, to maintain its credit, and to operate successfully and efficiently has been impeded."

At that point in its opinion the Supreme Court inserted the following footnote:

> "The Commission stated on this phase of the case: 'The evidence discloses that the respondents' business is exceptionally free from serious business hazards. The gas supply is assured for at least thirty to thirty-five more years. We have made ample provision in the annual depreciation allowance for the restoration of the capital investment in the property over the claimed life of the gas supply. The respondents' markets are rapidly expanding and embrace the large metropolitan area of Detroit, which alone takes 40 per cent of the entire output under a long-term contract. Panhandle Eastern's president testified that the demand for service is so great that within the next year the respondents will be called upon to sell every cubic foot of gas that can possibly be delivered through the lines, and that the capacity factor will increase from 70 per cent to 90 per cent.
>
> "'It is likewise apparent from respondents' own evidence that Pan-handle Eastern has been able to raise considerable capital at low cost. Only recently it successfully completed a financing program at remarkably low rates which resulted in a substantial reduction in its annual cost of capital. * * *'"

When the Hope Natural Gas Company case, affirmed in 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed 333, was before the Commission, the Commission's opinion included the following on the subject of rate of return, 44 P.U.R., N.S., 1, 32:

> "The record contains an abundance of evidence on subject of rate of return. The information includes investors' appraisal of the natural gas industry, comparative risk data, interest rates and yields on securities of natural gas and electric utilities, statistics showing the growth and stability of the natural gas industry, the trend of the cost of money and its current cost, commodity price indices, industrial production, employment, and payroll indices. Federal reserve bank discount rates, national income payments and other economic data, idle money statistics, the financial history of the Hope Company and the facts about recent financing by its parent Standard Oil Company. * * *
>
> "The company's contention that it should be allowed a rate of return not less than 8% is unreasonable. The record shows that the Hope Company is a seasoned enterprise whose risks have been minimized by (1) ample past and present provisions for depletion and depreciation with concurrent high profits; (2) protected established markets, through affiliated distribution companies, in populous and industrialized areas; and (3) available supplies of gas locally to meet requirements except on certain peak days in the winter, which it is feasible to supplement in the future with gas from other sources. During the forty-two years of its history, to 1941, Hope has earned on its owners' equity an annual average profit of 12 per cent and, in

addition, has built up * * * reserves far in excess of requirements. * * *

"In making the findings on rate of return, the national and international situations have commanded our attentions and entered our deliberations. The Commission is aware of the increased demands made upon Hope for gas due to the war program. Considering these matters, the underlying factors, and all of the evidence in the record, the Commission finds that 6½% is the fair rate of return for the Hope Natural Gas Company. This rate of return being for the future has been set only after endeavoring to weigh all known and predictable elements, in setting it we have made allowance for presently unforeseeable contingencies. Our views on the subject of rate of return are consonant with recent decisions by the Supreme Court and other courts and Commissions involving natural gas companies. [Citing, inter alia, F. P. C. v. Natural Gas Pipeline Co. [of America], 315 U.S. [575] 576 [62 S.Ct. 736, 86 L.Ed. 1037.]"

In the case concerning the Canadian River Gas Company, 43 P.U.R., N.S., 205, 229, the Commission considered and discussed, and set out in its opinion, much material similar to that set out above in the Hope case. The Commission then said:

"Canadian Company has a long-term, and essentially cost of service contract, with its affiliate, Colorado Company. Colorado and Wyoming companies' sales are also principally to subsidiaries or affiliates and to stable markets. Colorado Company's principal industrial sale to Colorado Fuel and Iron Corporation is made to an affiliate. All these facts materially reduce basic business risks that might be present under other circumstances."

Other opinions of the Commission in rate of return controversies show that the Commission states and considers very many practical matters which affect the application of the practical expert judgment that the Commission has. It certainly appears that consideration of the financial history and conditions of the Hope Natural Gas Company, disclosing that Standard Oil Company was Hope's "parent", and that Hope had paid out substantial profits for forty-two years, and had accumulated reserves "far in excess of requirements", must have materially affected the Commission's decision on rate of return in that case. Further, in the Canadian River Gas Company case, it certainly was a material consideration that most of that Company's sales were to affiliates or subsidiaries, and that thus the normal risks of the business were reduced. All such considerations must enter into the Commission's determination that the rate of return it allows is "just and reasonable" in that it will "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed * * *." Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333. Consideration of the age of a company, its stability, its financial tie-ups, its established and potential outlets, whether the company is expanding or is consolidating its position—all of these things and many more must affect the determination as to how the company will attract capital, and maintain its financial integrity, at a certain rate of return. And it is settled and stated in many cases that the rate of return, from the point of view of the investor, must be sufficient to assure a proper return to the investor and to maintain the company credit and to attract capital. The Supreme Court makes it clear that there are considerations beyond that of the yield to investor. In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 the Court states:

"But such considerations [the balancing of the consumer and investor interests] aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough rev-

enue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 345–346, 12 S.Ct. 400, 402, 36 L.Ed. 176. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. *That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.*" (Emphasis supplied.)

In the case under review we are not given any indication that the Commission has so exercised its practical, expert judgment. We are given instead a study that the Commission has made as to the rate of yield of various natural gas companies. We know only from our own search of the record how those yields compare with those of other utilities, and we have no way of knowing how the Commission would rate the risks in' the company here under consideration and other companies. In a footnote to its opinion, the Commission sets out the following:

56% bonds x 2.55% cost of borrowed money .............. 1.43%
44% common equity x 9.25% return on common (including ½% cost of flotation)... 4.07%
                                    ——————
                                    5.5%

How much weight the Commission ascribed to this equation, we cannot know. It is obvious, however, that no rate of return determination can be set out so meagerly and have conclusive value.

■■■ This court recognizes that the scope of its review is limited. Following Federal Power Commission v. Hope Natural Gas Company, supra, if the "end result" of the formula adopted by the Commission is "just and reasonable", then our judicial review is at an end. It is clear also that the Commission is not bound to the use of any particular formula or group of formulae in determining what is a "just and reasonable" rate.

However, the Congress has provided for judicial review of the orders of the Federal Power Commission in such cases. Obviously there must be some review. And as Mr. Justice Jackson stated in Federal Power Commission v. Hope Natural Gas Company, supra, 320 U.S. at page 645, 64 S.Ct. at page 308, "If we are to hold that a given rate is reasonable just because the Commission has said it was reasonable, review becomes a costly, time-consuming pageant of no practical value to anyone."

■■■ Accordingly, we hold that the findings made as to the allowed rate of return are insufficient, and that this case must be remanded to the Commission with direction to set out more fully and particularly the facts and the reasons bearing on its decision as to the rate of return. We have no desire to substitute our judgment for that of the Commission, and therefore we have no occasion to set out what we feel would be a fair rate of return. What is of importance is that we are unable from the reported findings to arrive at a reasoned conclusion that the 5½% rate of return allowed by the Commission is "just and reasonable". The Commission has not sufficiently explained why it considers that rate reasonable, other than that it provides a yield to the common stock owners of Northern comparable or greater amounts than those yielded by other natural gas companies. Against that consideration, we find the following in the record (of which there is no mention in the Commission's opinion):

(1) Voluminous testimony, both oral and written on behalf of the Petitioner, tending to show that a 6% rate of return is the absolute minimum rate which would provide a return which would be "just and reasonable".

(2) The finding of the Presiding Examiner, who conducted the hearing in question, as follows:

"Insofar as Northern and the Staff differ as to the particular import of the factors to be included in the consideration of the earnings price ratios, the ex-

tent of market pressure, and the trends of the interest costs, and the dividends paid on outstanding securities, all factors from whatever basis must be considered in determining what is a fair rate of return which ultimately is a judgment determination. The fair rate of return when considered in connection with current investor requirement necessarily includes to a limited extent the anticipations of the immediate future, which has particular application in the case of Northern, which already has contemplated further expansion of facilities to increase its utility service. To that extent, future expectations are not to be neglected and in view of the factors which can be definitely determined, and in those areas in which judgment plays a greater part than computation, it appears that the rate of return of 6% is a fair and reasonable return which must be provided for Northern upon the present state of the record."

(3) The testimony of the expert witness called by the Commission, who stated as follows in his testimony:

"Q. (By counsel for the Federal Power Commission) Mr. Goubleman, at this time do you have an opinion as to a fair and reasonable rate of return for Northern Natural Gas Company? A. I believe that a rate of return of 6 percent would allow the company to attract capital and that perhaps this figure might be on the high side and might be shaved somewhat."

This witness gave a detailed explanation why he thought 6% should be the maximum return, and then gave figures showing that 5¾% might be adequate.

(4) The fact that no witness, as far as our examination of the record discloses, testified to a rate as low as 5½%.

■■■ A mere assertion that the Commission has examined "all of the available evidence of record on this subject" does not suffice to show this court, on review, that the conclusion of the Commission as to the rate of return is the result of the application of the Commission's expertise and judgment so that we would affirm. The

Administrative Procedure Act, 60 Stat. 237, 5 U.S.C.A. § 1001 et seq., is applicable to determinations made by the Federal Power Commission, and that Act provides, 5 U.S. C.A. § 1007(b): "All decisions * * * shall become part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; * *." Whether the "end result" is just and reasonable we cannot say, since we do not know the findings and reasoning of the Commission except as to the rate of yield, and therefore we do not feel that the Commission's decision on the rate of return should be affirmed. Not only does the 5½% rate allowed appear to be the lowest ever allowed by the Commission, but the Presiding Examiner's finding and the testimony of the Commission's own expert rate-of-return witness militate against it.

The case must be remanded to the Commission with direction to make additional findings and conclusions upon its determination of the issue of Rate of Return, including its reasons and basis therefor so as to comply with the requirements of 5 U.S.C.A. § 1007(b).

10. The contentions that the Commission failed to make adequate findings to support its conclusions, that it based them on insufficient evidence, disregarded pertinent evidence and legal standards and acted arbitrarily, capriciously and in deprivation of the rights of the natural gas company, have been considered in connection with the several conclusions that have been reviewed and are not sustained except as we have found insufficiency of findings and reasons to support the conclusion on the rate of return.

The actions of the Commission brought here for review by the petitions are affirmed in all respects except as to Rate of Return. Reversed and remanded as to that issue only for further proceedings in accordance with this opinion.

JOHNSEN, Circuit Judge (concurring separately).

I should not engage in this separate expression, except that on some matters my

thinking has taken me over a slightly variant course, although I have tried for the sake of unanimity to avoid allowing it to lead me to a different result. I shall here, however, discuss only a single question which I regard as the most important and most perplexing one in the case, in order to bring it a little more fully into the spotlight.

I initially felt, with some degree of conviction, that the Federal Power Commission was required, or at least deferentially ought, in the balancing of proper state and national interests, to have accepted, for purposes of its formulaic processes, the attribution value mandated by the State of Kansas, of 8 cents per thousand cubic feet at the wellhead, on all natural gas taken from Kansas ground,[1] as representing a legally fixed production cost, under the State's right and policy of conserving its natural gas resources, preventing any profligate promotion or exploitation of them, and conditioning undiscriminatingly as between local distribution and commerce the privilege of removing them from the ground, and within the authority which it seems to me that the Natural Gas Act has specifically permitted to remain in the States to regulate production.[2]

Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190, and Phillips Petroleum Co. v. State of Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204, leave no room for any further contention of inherent invalidity in such an attribution mandate as a federal question in relation to a State's powers of regulation generally, or as to the amount of the attribution value here fixed being possibly so unreasonable as legally to lack fair relationship to its object or as to constitute an undue burden as such upon interstate commerce. The only question not answered by these decisions as to the validity of such a form of state regulation—because the question was not there involved—is whether the making of such an attribution order by a State, as a conservational, pre-

ventive and conditioning measure in production, is in conflict with or otherwise excluded by the nature and scope of the federal authority which has been asserted in the natural gas domain through the Natural Gas Act.

The Act itself provides, as has been indicated in footnote 2, supra, that its provisions have no application to "the production or gathering of gas." But the Act also leaves no doubt as to its intent to preempt fully the control of all rates charged for jurisdictional gas, as a question of whether they are "just and reasonable", on the basis of all necessary elements of consideration, including overall result. This then directly poses the question of whether such an attribution value as has here been mandated by the State of Kansas as a production cost, which concededly is otherwise regulationally valid, can be refused operation and effect as a state conservational, preventive and conditioning measure, as being excluded by the Natural Gas Act, because of its possible touch upon the Federal Power Commission's rate-fixing powers.

I should be hesitant in view of the fact that Congress has left the field of production and its regulation exempt from federal invasion, to answer the posed question, in its application to such an otherwise proper and manifestly purposive guarding by a State of its gas resources in production, except upon the same basis that it has been many times answered as to a state regulation of some matter of local concern which may affect commerce—that the mere fact that such a regulation may have some impact upon commerce, as an incident and not as an undue burden, does not require that it be given federal nullity. No more, it would seem to me, ought such a conservational, preventive and privilege-conditioning regulation in the state-preserved field of production to have its operativeness abstractly and generally cut off, just because of its incidence legally as a rate element or factor.

---

1. "except gas for the operation of leases" —not here involved.

2. "The provisions of this Act * * *

shall not apply * * * to the production or gathering of natural gas." 52 Stat. 821, § 1(b), 15 U.S.C.A. § 717(b).

Justness and reasonableness from the standpoint of consumer consideration could hardly be said to require such a holding, since the attribution value necessarily would have had to be recognized by the Federal Power Commission, if Northern Natural had purchased from others the approximately 13 per cent of its gas supply which it took from its own wells in the State of Kansas (just as the Commission in effect did recognize the attribution value as a legitimate element of cost as to the gas which Northern Natural was so purchasing) and this amount obviously would in that event have had to be paid by the customer. Nor, in the present situation, on the amount here involved, with the rest of the elements used by the Commission left standing, would it be possible to say that the additional return to Northern Natural as a result thereof would be publicly or industrially intolerable on its face, since, thus considered, its consequence would be to give Northern Natural a return of approximately 6 per cent instead of the 5½ per cent which the Commission allowed.

But in any event, in the viewpoint here being discussed, all of these considerations would have had to be weighed against the State's interest in conservation and its right to control production to that end, before there would be any right to say that they were excluded or outweighed as a matter of federal interest, just because of the incidental effect which they might have upon customer rates or upon Northern Natural's financial position in the particular situation.

I recognize, however, that there also is some possible basis in the situation for contending that, since the State of Kansas could have nothing to say about how much more or whether anything more was charged for the gas which Northern Natural distributed than the attribution value which it had mandated, its attribution order could, in a certain legal sense at least, be said not to have been here nullified or dishonored, within the scope of its right to make complaint, in view of the fact that the rates fixed by the Commission had all

been in excess of 8 cents per thousand cubic feet. And, of course, only insofar as it would be necessary to respect the attribution order in favor of the State of Kansas, as a proper exercise of state policy and interest, would there be any occasion to consider Northern Natural's claim to have it recognized.

The contention which I have just stated is one which is more escapive than satisfying to me, but, for the sake of unanimity in our disposition, I shall accept it as a sufficient basis for avoiding a dissent, in that it still preserves for me the position that the Federal Power Commission could not completely ignore the attribution order as a proper state regulation in the field of gas production.

I might add just a word on the remand which is being directed for further consideration and explanation by the Commission of the matter of rate of return. I recognize that the judgment of the Commission in this field, unless confiscatoriness or discriminatoriness is manifest, must ordinarily be accepted in a particular situation. Here, however, the Commission is venturing upon a pioneering change in its rate-of-return concept, which presumably is intended to set a pattern and to establish a future policy. This is being done at a time when the investment and financing market has been evidencing an increasing and projective demand for return climbs, over those which have existed for the past several years, and similarly while costs of production are still continuing in their economic rise. Other events also have happened, such as the permission since given Northern Natural by the Commission to make substantial expansion. All of these elements, in the time which has elapsed since the Commission's order, should give it a better opportunity for evaluation and explanation than its present order reflects, as a basis for any pioneering change in previous concept and apparent future policy and a more solid foundation for a court to feel satisfied to give approval to it.